They asked to reserve their rights under the first appeal.

We have no concern with these last-mentioned appeals.

Appellee directs his attention exclusively to the asserted nullity of the first—the suspensive appeal.

No question but that a motion for a suspensive appeal, to serve as a notice on the appellee, must be made in open court. The language of the Code is plain.

When the appeal has been granted upon motion in open court, the judge shall grant the appeal, if party applying has a right to an appeal.

In such a case no citation of appeal or other notice shall be necessary. Code of Practice, art. 573.

There was no motion submitted in open court.

The question of vacation of the court and the termination of the term has been considered in several cases.

Although the case is not directly germane, this court had occasion to consider a somewhat similar point in Conery v. His Creditors, 118 La. 864, 43 South. 531.

Although in that case there was authority, the court found, to issue the order that had been issued at chambers, if the court had not that authority in the language of the statute, plaintiff's demand would not have been rejected. It would have been granted.

The issue involved here was directly decided in McGaw v. O'Bierne, 124 La. 989, 50 South. 819, and in Hardy v. Stevenson, 27 La. Ann. 95. There was no "authority" found in this last case.

In the former case, the court went further than there is any necessity of holding in this case in order to arrive at the conclusion that the appeal must be dismissed.

In the first of the two cases just cited, the court directly held that an appeal taken in vacation, even though taken in open court, was not such an appeal as dispensed the appellant from giving proper and sufficient notice to the appellee; that such an order of appeal must be obtained by petition and due service made.

Although Act No. 94, p. 117, of 1898, was limited to the country parishes, it is significant that it contains express provisions authorizing the judge to grant an order of appeal and to fix the appeal bond at chambers.

The motion is regularly before us. We must decline referring it to the merits, as under the rule of this court it is called and submitted in due course.

Questions are to be decided as they come up. There can be or should be no delay, if not actually necessary.

The motion to dismiss is sustained, and the appeal dismissed.

---

(53 South. 475.)

No. 18,316.

PUCKETT v. FOX GROCER CO., Limited.

In re PUCKETT.

(Oct. 17, 1910. Rehearing Denied Nov. 14, 1910.)

*(Syllabus by the Court.)*

BILLS AND NOTES (§§ 518, 519*)—ACTIONS—EVIDENCE—DECEIT.

    This being a suit upon a promissory note, given by the owner of a plantation, as representing the purchase price of certain notes for a larger amount, given by tenants of the plantation to the former owner, and the defense being that plaintiff is liable as indorser of said tenants' notes, and that there was want of consideration for the note sued on, in that the tenants were not financially responsible, as represented, *held*, that the indorsement placed on the tenants' notes was intended merely to convey title, and that the representations in regard to the financial condition of the tenants were not intended to deceive, and did not deceive, the defendant.

    [Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1802, 1819; Dec. Dig. §§ 518, 519.*]

Action by Mrs. Celia Puckett against the Fox Grocer Company, Limited. A judgment for defendant was affirmed by the Court of

Appeal, and plaintiff applies for certiorari or writ of review. Reversed and rendered.

Dawkins & Dawkins, for applicant. Percy Sandel, for respondent.

### Statement of the Case.

MONROE, J. Plaintiff brings this suit on a note of "Renaud-Fox Company, Limited," for "$1,000, dated March 7, 1907, and made payable in one year, with interest from maturity, and it is admitted that defendant, Fox Grocer Co., Limited," is the successor of the maker and is liable if the maker would be liable. The answer is that the note was given for the purchase price of five other notes, aggregating $1,451.42, made by certain tenants, payable to the order of plaintiff, and by her indorsed, after maturity, as valid and collectible; that the makers are, and have always been, insolvent, to the knowledge of plaintiff; that defendant would not have purchased said notes but for the representations and guaranty and indorsement of plaintiff; and that there has been, and is, a total failure of the consideration for which respondent executed the note sued on. The prayer of the answer is "that plaintiff's demand be rejected, and that respondent recover judgment against said plaintiff for the full amount of the notes acquired by it from her," or, "in the alternative, that said assignment of said notes, by plaintiff to respondent, be rescinded, annulled, and avoided, for want and failure of consideration, and a restitutio ad integram ordered," etc.

On the first trial the district court gave judgment for plaintiff, who was, however, nonsuited in the Court of Appeal. In the second (present) suit there was judgment in the district court in favor of defendant, which was affirmed by the Court of Appeal, and it is that judgment which we are now called on to review.

It appears from the evidence that on March 12, 1907, plaintiff sold to defendant a small plantation, in the parish of Ouachita, for $7,500, of which $2,500 were paid in cash, and for the balance defendant gave five notes of $1,000 each, payable year by year. Prior to the sale, to wit, on March 4th, plaintiff, through her son, had obtained, from certain negro tenants on the place, four of the notes which were afterwards transferred to the defendant, the fifth note having been obtained, apparently, on March 15th; and she also obtained, either before the sale or between the date of the sale of the place and that of the sale of the notes, the retrocession of a pair of mules which had been bought for a tenant named Joel Scott. We infer from the testimony that defendant contemplated leaving the parish of Ouachita, and that the same was true of her son, who appears to have been attending to some business for her, but who resided in West Virginia. Plaintiff was therefore interested in closing up her business relations with her former tenants and in getting rid of such property, connected with the plantation, as had not been included in the sale, and, with that view, was, apparently, willing to sell it for less than its face value. She appears, accordingly, to have placed the matter in the hands of her son, with instructions to that effect, suggesting defendant as a probable purchaser, because it had become the purchaser of the place. At this point there is some conflict between the testimony given by plaintiff's son (a young man with limited experience in business matters) and Mr. Fox, defendant's president.

Puckett testifies, in effect, that he called on Fox (representing defendant) and agreed to sell him the tenants' notes, only a few days old, payable one day after date, with interest at 8 per cent. per annum from date, of the face value of $1,451.42, for $1,000, to be represented by defendant's note, payable in one year, without interest (until after maturity), and, in addition, as we understand

the testimony (though it is not altogether clear on that point), defendant was to get the two mules which had been bought for Joel Scott and surrendered by him. The witness, being asked to state what took place between him and Fox, said:

"I asked Mr. Fox what he wanted to do with the stock on the place, whether he wanted me to sell it, or whether he wanted to buy it, at a cash value, and he told me that he might as well buy it—if he didn't buy it that he would have to buy some other. Q. What was then done? A. We figured the stuff at what we thought was a cash value on it, and Mr. Fox gave me his note, and I turned these notes over to him. He gave me his note, and I carried the note and left it with Mr. Julius Lemle, and, the next day, or the day following, Mr. Fox called me in his store * * * and told me that he could not collect these notes unless I transferred them to him, and I asked him what to do (I never transferred a note before), and he told me to sign my mother's name on the back and mine under it. * * * Q. In reaching the amount of $1,000, how did you arrive at that basis, of $1,000 for $1,500 worth of notes? * * * A. We went over the list of the stock that was on the place and stuff there and arrived at it in that way. We took each negro up, that owned stock, and estimated what it ought to be worth at a cash price on it."

Testifying as to what the tenants, by whom the notes were given, possessed, he said: That West Wales (whose note is for $795.42) had two mules, worth $250, and probably 25 bushels of corn, and some cows. That Ellis Barcus (whose note is for $171) had a pony, worth $20; a wagon, worth $15; two plows, worth $5 each; and not less than 30 bushels of corn.

"That there were two mules left there on the place there wasn't any notes for. Q. No note for? A. Two mules, bought for Joel Scott; he turned them back to me. (Objected to by the defendant for the reason that it is irrelevant and immaterial for the reason that there is no note of Joel Scott in this transaction at all, and for the further reasons that it is not covered by the pleadings.) * * * Q. What statement did you give Mr. Fox, at the time that he gave you the $1,000 note, of what these negroes had? A. I told him that West Wales had two mules, worth about $250 or $300. I told him about Aleck Robertson having about $285 worth of stuff; and I told him that old man Barcus had some stuff that we put down for $50: and Dink Watson—we had just bought a mule for him, for $125. * * * Q. How came you to sell these notes to Mr. Fox? A. I was working in West Virginia, and I wanted to go back to my own work, and I didn't want to take time to sell them or gather the stuff up. Q. What did Mr. Fox tell you about wanting to buy the claim against the negroes in order to keep them and their stock on the place? (Objection and ruling.) A. He said he had just as well buy that stock to run the place with. Q. What authority did you have from your mother to indorse these notes? A. Didn't have any authority to indorse them; she told me to transfer them."

Mr. Fox testifies, in part as follows:

"Q. How come you to purchase these notes * * * from Jno. Puckett and Mrs. Celia Puckett and give the note of the Renaud-Fox Company, Limited? A. I had bought their plantation from them, and a short while afterwards Mr. Puckett came to me and told me that these negroes owed him these notes, and, as I had bought the place, he did not care to molest them, and told me that all the negroes had plenty of stock, and that he did not care to seize everything, and that, if I would take the notes, he would let it pass; and I bought them with that understanding, to keep them from seizing everything that was on the place. * * * Q. What, if anything, was said to you about the responsibility of the makers of the notes? (Objection and ruling.) A. He told me that they were collectible and that they were all right, and that he had to leave here and had no time to fool with it any longer. * * * Q. How come you, Mr. Fox, to purchase these notes against these negroes on the plantation? A. Mr. Puckett represented to me that they had sufficient stock that I could collect the notes out of, and that he had to leave to go back to his position, and that he did not have time to fool with them, and told me that, if I would buy these notes, he would indorse them and would save him the time trying to collect them, and, possibly, taking off the stock from the plantation, and I bought them for that reason. Q. Then, you bought those notes in order to keep the hands from being molested by Mrs. Puckett or any one representing her? A. On his representation that the negroes had sufficient stock to make the notes collectible and on his indorsement of the notes."

Mr. J. G. Michie, who was the bookkeeper of Renaud-Fox Company, Limited, at the time of the transaction in question, testified, on the first trial, in part, as follows:

"As far as I know, Mr. John Puckett effected the deal, and I do not know what conversation passed between Mr. Puckett and Mr. Fox, but most of what I know was told me by Mr. Fox. Mr. Fox bought this place for $7,500, I believe, and paid $2,500 in cash, and gave five notes for $1,000 each. * * * He was to give her $5,000, in five notes, payable each year, and he

told me in regard to this that this was in consideration that he was buying $1,700 worth of notes for $1,000, for which he was to give his note for $1,000, and he was rejoicing over the transaction as he had made a good profit and would make an extra 25 per cent. when their accounts would be collected. When Mrs. Puckett came, in the fall, whenever the note fell due, to collect this note, he refused to pay it on a technicality about this boy indorsing the note as I understand it, and that he could not collect from the negroes. That is the way it was told me by Mr. Fox, and when she came in to collect this note he refused to pay it. Q. Why did Mr. Fox say that he had bought these notes of the negroes? A. My understanding was, from Mr. Fox, that these notes were in consideration of the purchase of the place; that the place would be stripped of all the hands and stock if he did not take up the notes. Mr. Fox said that there was no use in paying this $1,000 note unless he was made to by the court; that there was no necessity of his paying this note; that there was a technicality; and that, if he was made to pay this $1,000 he would attach this $1,000 and collect the $1,700 worth of notes. In other words, he would not have to pay out a cent. That is all I remember. Q. Why did he say that he had purchased these notes of the negroes? A. He had purchased them in order to keep Mrs. Puckett from stripping the place of the stock that was on there which would cost him more than $1,000 to replace. That is what he told me. Q. What guaranty of payment of these darkies' notes, that were transferred to him, did he claim had been made to him by John Puckett or Mrs. Puckett? A. None, whatsoever, he told me that he did not. Q. How did he state to you the transfer of these notes was made? A. He simply bought these notes, straight out, by giving her a note for $1,000, and her son, I understand, indorsed them. I never noticed the indorsement on the back of them at all. Cross-Examination: Q. You don't know what the conversation was between Mr. Puckett and Mr. Fox? A. No, sir; I don't know."

Mr. A. Renaud was secretary and treasurer of Renaud-Fox Company, Limited, at the date of the transaction in question. He testified, in part, as follows:

"Q. State, Mr. Renaud, how that transaction was made and what was the consideration of those notes. A. As far as I recollect, I did not have anything to do with the purchase of those notes. Mr. Fox attended to that part of the business. I understand that we bought those notes, worth $1,700—I don't know, I never seen the notes—for $1,000, for which Renaud-Fox Company, Limited, gave their note for $1,000, payable 12 months after date, without interest. Q. What guaranty of payment was made by Mrs. Puckett of those notes sold to Renaud-Fox Company, Limited? (Objection and ruling.) A.

None that I know of. * * * Q. What did he (Fox) tell you of this transaction? A. He told me, if my mind is correct, that we bought $1,700 of notes for $1,000, in order to keep the stock on the place. That is what I understand. * * * Q. What did you tell him, if anything, about paying this note of $1,000? A. I stated, a while ago, why he did not pay this note, and said because he had those notes as collateral. Q. What did you say to him about the payment of this note? A. I said I thought we owed it.

Mr. Walter Etheridge (a cousin of plaintiff) gave the following testimony:

"Q. What conversation did you have with Mr. Fox, the day this $1,000 note, due Mrs. Puckett, became due? A. The day the note fell due, my recollection is that Mr. Fox was in Texas; but, the day he came back, Mrs. Puckett made a demand on him for the money, and he refused to pay, and she came over to my store and told me about it, and asked me to if I would go and talk to Mr. Fox about it, and I went over and asked him what objection he had to paying the note. He said that the negro Aleck Robertson had refused to pay one of the notes that he had given for another negro. I told Mr. Fox, if that were the only objection, we would take that amount, and that Mrs. Puckett would carry that herself. Q. What other objection did he make to paying the note? A. None, whatsoever. Q. What claim did he make about these other notes being worthless or his inability to collect them, at the time? (Objection and ruling.) A. He never said anything about them; he never mentioned being unable to collect any other notes. * * * Q. At the time you went over to collect this note, what claim did he make as to any indorsement or guaranty by Mrs. Puckett, or John Puckett for Mrs. Puckett, to these negroes' notes? A. There was nothing said of indorsements or anything of that kind, when I went over and talked to Mr. Fox. He said he would not pay it on account of this note of Aleck Robertson's, and I told him that, if that was where the hitch came, Mrs. Puckett would take the amount from the $1,000 and he could pay her the difference, and he refused to pay that, and nothing else was said about any other notes, and I walked out and haven't talked to Mr. Fox about the matter since."

On the second trial, Mr. Michie testified that he was present in the office when the conversation, about the transfer of the tenants' notes, between Fox and Puckett, took place. His testimony on that subject reads as follows:

"I saw him (Puckett) and Mr. Fox in the office together. They were sitting at Mr. Fox's desk. I suppose I was as much as six or eight feet away. Q. What did you hear Mr. Fox tell

Mr. Puckett in regard to the transfer of those notes? A. I heard Mr. Fox tell Mr. Puckett to write his mother's name on the back of those notes. I didn't hear much of the conversation on account of being busy and not listening either."

The tenants' notes are as follows: One by Aleck Robertson for $150; one by Aleck Robertson for $135; one by Ellis Barcus for $171; one by Dink Watson for $200; one by W. H. Wales for $975.42—total $1,451.42.

The note of $150 was given by Robertson as the price of a mule that plaintiff had bought for him, and it is admitted that he offered to pay it, though he seems to have disputed the other note given by him.

Mr. Fox testified: That he collected, he thought, $125, as rent for the year 1907, from Robertson. That he furnished Dink Watson, during that year, with his supplies, and thought that he had failed, by $20 or $30, in paying his account for supplies and rent; his recollection being that the amount paid by him was $150 to $160. That he also furnished Barcus with his supplies and was paid for the supplies and rent in money and cotton. He also furnished Wales and received money and cotton from him, though he was unable to state the amount. It does not appear that he made any effort to collect any of the notes which he had bought from plaintiff, and, in fact, he declined to receive payment of the $150 note given by Robertson, and Mrs. Puckett was not informed that he did not intend to pay the note of $1,000 until it fell due and payment was demanded, though it seems probable that some intimation to that effect was given, a short while before, to Mr. Julius Lemle, who held, for collection, the note first falling due, which had been given in part payment of the price of the plantation. Mr. Lemle, it may be remarked, testified that the tenants, whose notes are here involved, are good, industrious, negroes; that he had sold Wales, Scott, and Watson five mules, for which he had been paid by Mr. Puckett; that the mules were worth $125, each, cash, though he had received a higher price; that Robertson had about $400 worth of stock; so that, including the mules sold to Scott, $1,000 could have been made out of the tenants; that Robertson came to him to pay his note of $150; and that Watson also came to him (thinking that witness held the note which he had given) to pay for the mule which he had bought, and the price of which (as we understand the witness) was represented by, or in, his note for $200. The witness further testified that on March 12th, when the first of the mortgage notes fell due and was paid, Mr. Fox notified him that he did not intend to pay the $1,000 note falling due on March 20th, following, giving as his reason that he could not collect the notes of the negroes; that he said nothing about Mrs. Puckett's having indorsed those notes; that witness wrote to Mrs. Puckett informing her that Fox had so notified him. Mrs. Puckett testified, in effect, that she instructed her son to sell the notes, and that he was authorized to transfer the title, but not to bind her as indorser.

## Opinion.

The Court of Appeal says, in its opinion:

"The plaintiff admits that she authorized her son to transfer the tenants' notes to the defendant company for its note of $1,000, now sued on. Her son did transfer the said notes, in the manner usual in the business world, by indorsement. The plaintiff does not contend that she instructed her son, or agent, to indorse the notes without recourse, or that, in the negotiations between her and the defendant company, any such understanding was had. She now contends that her son exceeded his authority in indorsing the notes as he did. In other words, her position is that she understood the contract to be that she was simply to sell the tenants' notes to the defendant company, without any liability on her part as indorser on them, and to receive in payment defendant's note for $1,000. This may all be true, and yet we think it will be conceded that, if the defendant, at the time of the deal, understood that the plaintiff was to indorse the notes and was unwilling to give its note upon any other condition, there was no agreement of the minds of the purchaser and seller, and that neither is bound. This is a question of fact, and the only positive evidence

on the point is the testimony of the plaintiff's son, on the one hand, and Mr. Fox, the president of the defendant company, on the other. The substance of Mr. Puckett's testimony on the point is that he sold the notes to the defendant, one day, and delivered them, and that, on the next day, he passed defendant's place of business, or went into it, and Mr. Fox told him that the notes could not be collected unless he (witness) would indorse them in his mother's name, and that he indorsed them. He does not contend that he ever told Mr. Fox that his mother would not sign except for the purpose of transferring the notes, or that there ever was anything said in regard to the liability of his mother in the event the notes were not to be paid. Mr. Fox denies the statement by Puckett as to the notes having been indorsed the day after their transfer to his company. He swears, positively, that the indorsement of the tenants' notes and the execution and delivering of the $1,000 note were all at one and the same time. He further says that he would not have bought the tenants' notes without Mrs. Puckett's indorsement, because he did not know anything about the makers of them and had never been on the place where they were but once. In the light of the facts as disclosed by the entire record, we do not see how it would be possible for the court to hold that the indorsement of the tenants' notes by the plaintiff was not a part of the consideration for the note sued on. The judgment appealed from is affirmed, etc."

We agree with the learned court that, if the tenants' notes were transferred by, what was intended to be, a contract of indorsement, as understood by the law merchant, and plaintiff's agent, by whom the transfer was made, was unauthorized in the premises, there was no contract; and that what the understanding was, as to the character and intended effect of the transfer, is a question of fact. But we cannot concur in the view that the only positive evidence on the point is the testimony of the plaintiff's son, on the one hand, and of Mr. Fox, on the other. Mr. Michie, defendant's bookkeeper, and Mr. Renaud, defendant's secretary and treasurer, testify, most positively, that they were given to understand by Mr. Fox that he had bought the tenants' notes for his own protection as the owner of the place on which the tenants were working, and because he did not want them molested; the meaning of the testimony being that he (Fox) did not,

at that time, consider Mrs. Puckett otherwise than as a mere vendor who warranted nothing more than the genuineness of the instruments and, no doubt, the truth of any representations which, through her son, she may have made with regard to the makers. When, afterwards, Mr. Fox concluded to resist the payment of the note sued on, he told Mr. Michie (according to that gentleman's testimony) that "he refused to pay it on a technicality about the boy indorsing the note." And so well was it understood that he was relying upon the supposed indorsement as a purely technical defense that Mr. Renaud, who was also a member of the defendant company, says in his testimony, in answer to the question:

"What did you say to him about the payment of the note? I said I thought we owed it."

We think, too, that the testimony of Mr. Puckett is hardly susceptible of the construction that he meant to say that "Mr. Fox told him that the notes could not be collected unless he (witness) would indorse them in his mother's name, and that he indorsed them" (meaning that he indorsed them in the sense of the commercial law). What the witness said was:

"About two days after I had swapped notes, or possibly the next day or day afterwards, Mr. Fox called me in his office and said: 'I want you to *transfer* these notes to me, *so that I can collect them.*' And I simply asked him, 'How shall I indorse them? or, at least, transfer them.' And he said: 'Write your mother's name and yours under it.'" (Italics by the court.)

Elsewhere he testifies that he had never before transferred a note. He also says that Mr. Michie was in the office when the above-recited conversation took place, and he is corroborated by Mr. Michie, who says that he heard "Mr. Fox tell Mr. Puckett to write his mother's name on the back of these notes." All of which is quite different from the reason given by Mr. Fox, from whose testimony it would appear that Puckett came to him

with the proposition to indorse the notes in his mouth. Thus he says:

"Mr. Puckett represented to me that they had sufficient stock that I could collect the notes out of, and that he had to leave and go back to his position, and that he did not have time to fool with them, and he told me that, if I would buy these notes, he would indorse them and would save him the time trying to collect them and, possibly, taking off the stock from the plantation; and I bought them for that reason."

Apart from the positive testimony corroborative of the plaintiff's version of the transaction out of which the case arises, we are of opinion that the undisputed facts and the probabilities tend in the same direction.

Thus: It is nowhere suggested that Mrs. Puckett is not perfectly solvent. At the date of the transaction in question, she had just received from defendant $2,500 in cash, and defendant's notes secured by mortgage for $5,000, payable in from one to five years. Under such circumstances, the proposition that she would, intentionally, bind herself by indorsing the notes of the negro tenants of the plantation which she had sold defendant to the amount of $1,451.42, bearing interest at 8 per cent. from date, in exchange for defendant's note for $1,000, payable in 12 months, without interest, is in the highest degree improbable. The tenants' notes were dated March 4th (four of them) and March 15th (one of them) and were made payable one day after date. It was, no doubt, perfectly well understood, however, that the makers were unable to pay them, at that time, without great sacrifice, and that their ability to pay, in the future, would depend upon their farming operations, about which more would be known at the end of the year. The defendant was not only their landlord, but was also (with the exception of Robertson) their furnisher of supplies; and, whilst it seems to have collected pretty much all that was due it in those capacities, it made no effort to collect the notes which it had received from plaintiff, and its reason for not doing so was, obviously, the same as that which influenced it in getting the notes out of plaintiff's hands and into its own, to wit, that it did not wish that its tenants and customers should be molested or driven away or deprived of their stock or the means of planting and making their crops. All of which was natural enough, but, the proposition that, after pursuing such a course, in its own interest, the defendant could, at the end of the year, say to the plaintiff, "The makers of these notes have not paid them, and we now hold you as a commercial indorser," is unreasonable and untenable.

There is some suggestion to the effect that defendant could not have enforced the payment of the notes in question by levying upon the mules and live stock of the tenants; but, as we have seen, for reasons of its own, it did not want to levy on the mules, and, apart from the fact that the money represented by the notes appears to have been largely due for the purchase price of the mules, defendant's position is that it was upon the basis of the tenants' possession of such stock (and of the indorsement of the plaintiff) that it bought the notes, and it is not pretended that it did not know as much about the exemption laws at that time as it knew afterwards. As to the representations of Mr. Puckett in regard to the financial condition of the tenants, the evidence fails to satisfy us that they were intended to deceive, or did deceive, the defendant. Mr. Fox admits that one of his reasons for buying the notes was that he did not want the tenants molested and their stock seized, from which we conclude that he knew that they could not, then, pay the notes without making a sacrifice of that kind, and we think the tenants are shown to have owned about as much stock as they were represented to have had.

Upon the whole, and being in the same position with regard to the witnesses as our learned brethren of the Court of Appeal, we

concur in the conclusion reached on the first trial by the judge of the district court, who had the witnesses before him, to wit, that plaintiff is entitled to recover. It is therefore ordered, adjudged, and decreed that the judgment rendered herein by the district court and Court of Appeal be annulled, avoided, and reversed, and that there now be judgment in favor of the plaintiff, Mrs. Celia Puckett Wimberly, and against the defendant, Fox Grocer Company, Limited, in the sum of $1,000, with interest thereon at the rate of 8 per cent. per annum from March 20, 1908, until paid, together with 10 per cent. on the aggregate amount of the said principal and interest, as attorney's fees, and all costs herein incurred in said courts. It is further decreed that the demands of the defendant be rejected, and that defendant pay the costs of this proceeding.